UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

IN RE:
JAMES M. FAHEY, JR.,
        DEBTOR.

Chapter 7
Case No. 11-10505-WCH

CHARLES RASO,
        PLAINTIFF,

v.

JAMES M. FAHEY, JR.,
        DEFENDANT.

Adversary Proceeding
No. 11-1118

**MEMORANDUM OF DECISION**

**I. INTRODUCTION**

The matter before the Court is the Complaint filed by the plaintiff, Charles Raso (the "Plaintiff") against the defendant, James M. Fahey (the "Debtor"), in which he seeks a determination that certain contributions owed to an employee benefit plan are nondischargeable pursuant to 11 U.S.C. § 523(a)(4). On May 14, 2012, I granted summary judgment to the Debtor, concluding that although the plan satisfied the requirement of a technical trust, the Debtor was not a fiduciary.[1] The United States Bankruptcy Appellate Panel for the First Circuit (the "Panel") reversed, holding that the Debtor was acting in a fiduciary capacity, and remanded "for further findings on the issue of whether the nonpayment of contributions constituted a defalcation for purposes of § 523(a)(4)."[2] On remand, the parties filed a Joint Pre-Trial

---

[1] *Raso v. Fahey (In re Fahey)*, 470 B.R. 649 (Bankr. D. Mass. 2012), *rev'd*, 482 B.R. 678 (B.A.P. 1st Cir. 2012).

[2] *Raso v. Fahey (In re Fahey)*, 482 B.R. 678, 696 (B.A.P. 1st Cir. 2012).

1

Statement (the "PTS") and requested a determination based upon the admitted facts. For the reasons set forth below, I will enter judgment in favor of the Plaintiff.

## II. BACKGROUND

The Massachusetts Bricklayers and Masons Health and Welfare Fund, Pension Fund, and Annuity Fund (collectively, the "Funds") are three multi-employer employee benefit plans, as defined in 29 U.S.C. §§ 1002(3) and (37).[3] The Health and Welfare Fund and the Pension Fund were established in 1959, and the Annuity Fund was established in 1973, each pursuant to separate, but essentially identical, trust agreements (the "Trust Agreements").[4] The Plaintiff is trustee and treasurer for the Funds.[5] The Plaintiff is also the president and secretary-treasurer of the Bricklayers and Allied Craftsmen Local Union No. 3 of Massachusetts, Maine and New Hampshire (the "Union").[6]

Zani Tile Co., Inc. ("Zani") was a business located in Watertown, Massachusetts, of which the Debtor was the president, treasurer, and sole shareholder until the business ceased operating in August, 2010.[7] As Zani's "sole decision maker," the Debtor was in charge of day-to-day operations and was responsible for the company's bookkeeping, including payment of Zani's bills.[8] In 1977, Zani entered into a collective bargaining agreement (the "CBA") with the Union, under which Zani agreed to be bound by the terms of the Trust Agreements.[9]

---

[3] PTS, Docket No. 57 at ¶ 5.

[4] *Id.* at ¶ 4.

[5] *Id.* at ¶ 3.

[6] *Id.* at ¶ 1.

[7] *Id.* at ¶¶ 16, 25.

[8] *Id.* at ¶¶ 16-17.

[9] *Id.* at ¶¶ 6-7.

2

Specifically, Zani agreed to deduct from employees' paychecks amounts representing Union dues (the "Deductions") and forward the withheld amounts to the Funds.[10] Zani also agreed to pay contributions (the "Contributions") to the Funds for each hour worked by employees covered by the CBA.[11] The Trust Agreements provided that "all [C]ontributions shall be considered and defined as plan assets including [C]ontributions that are properly due and owing but not yet paid to the Fund by Contributing Employers."[12] The Contributions were distinct from the Deductions in that they were not amounts withheld from employee paychecks, but rather amounts paid on Zani's behalf from its operating funds.[13] The Debtor was responsible for overseeing payment of the Deductions and Contributions to the Funds, and each month Zani submitted remittance reports to the Funds indicating the amount of Contributions due for each employee.[14]

Zani was timely in its payment of Deductions and Contributions until November 2008, at which time payments became consistently late.[15] In March 2009, Zani ceased making payments altogether.[16] Zani also failed to pay both Massachusetts and Federal income taxes for its employees despite withholding such sums from their paychecks.[17] During that time, however, Zani was paying at least some of its other obligations—Zani made payments through August 2010 to Citizens Bank on account of a loan that had been personally guaranteed by the Debtor

---

[10] *Id.* at ¶ 9.

[11] *Id.* at ¶ 7.

[12] Raso Affidavit, Docket No. 18, Exhibits 1-3 at § 1.15. *See* PTS, Docket No. 57 at ¶¶ 8, 15.

[13] PTS, Docket No. 57 at ¶¶ 31-32.

[14] *Id.* at ¶¶ 11, 18

[15] *Id.* at ¶ 12.

[16] Raso Affidavit, Docket No. 18 at ¶ 15.

[17] PTS, Docket No. 57 at ¶ 19.

and secured by a mortgage on real property owned by the Debtor.[18] Further, between January 7, 2010 and April 26, 2010, Zani made weekly payments to the Debtor, each in the amount of $1,463.33.[19] The Debtor also received one-time payments from Zani of $6,000 on June 21, 2010, and $1,000 on June 26, 2010.[20] The Debtor maintains that these payments were repayment of a loan the Debtor had made to Zani while the Plaintiff asserts they were income.[21]

The Funds were able to collect a portion of the delinquent Deductions and Contributions directly from general contractors for which Zani had performed work, and the amounts collected were credited to Zani's account.[22] Even after these amounts were collected, Zani owed the Funds $183,518.92 for Deductions and Contributions that had accrued through April 2010.[23] Zani's payroll records indicate that additional Deductions in the amount of $3,180.88 and Contributions in the amount of $34,573.94 became due between May 2010 and August 2010.[24] In August 2010, Zani, lacking sufficient funds, ceased operations.[25]

On September 23, 2011, the Plaintiff filed a complaint against the Debtor and Zani in the United States District Court for the District of Massachusetts, seeking damages for the unpaid Deductions and Contributions.[26] The district court granted summary judgment in favor of the

---

[18] *Id.* at ¶ 21.

[19] *Id.* at ¶ 23.

[20] *Id.*

[21] *Id.* at ¶¶ 22, 24.

[22] *Id.* at ¶ 13.

[23] Raso Affidavit, Docket No. 18 at ¶ 17 and Exhibit 5.

[24] PTS, Docket No. 57 at ¶ 30.

[25] *Id.* at ¶ 25.

[26] *Id.* at ¶26.

4

Plaintiff and entered a judgment (the "Judgment") in the amount of $276,341.19, $15,917.50 of which represented unpaid Deductions with the balance of $167,601.52 representing contributions owed through April 2010.[27]

The Debtor filed his voluntary Chapter 7 petition on January 21, 2011.[28] He listed the Plaintiff's claim on "Schedule F – Creditors Holding Unsecured Nonpriority Claims," assigning it an approximate value of $200,000. On April 12, 2011, the Plaintiff filed a complaint seeking to establish the nondischargeability of all unpaid Deductions and Contributions pursuant to 11 U.S.C. § 523(a)(4). In response, the Debtor filed an answer on May 9, 2011. The Plaintiff subsequently filed a motion for summary judgment on January 23, 2012. The Debtor filed an opposition on March 2, 2012, in which he conceded that all unpaid Deductions, in the amount of $19,098.38, are nondischargeable.[29] Accordingly, the only issue for me to decide was whether the unpaid Contributions are nondischargeable. I held a hearing on March 9, 2012, at which time I took the matter under advisement.

On May 14, 2012, I issued a Memorandum of Decision with respect to the motion for summary judgment.[30] In it, I found that the Funds, as an ERISA plan, predated the act giving rise to the debt and was a technical trust, thus satisfying the first element of 11 U.S.C. § 523(a)(4).[31] Nevertheless, I concluded that Debtor lacked the necessary discretion required for fiduciary status under ERISA, because "[t]he option to breach a contract does not constitute

---

[27] *Id.* at ¶ 27.

[28] Chapter 7 Voluntary Petition, Docket No. 1, Case No. 11-10505-WCH.

[29] Memorandum of Law in Opposition to the Motion for Summary Judgment ("Opposition Memorandum"), Docket No. 29 at 3.

[30] *In re Fahey*, 470 B.R. at 649.

[31] *Id.* at 656.

5

discretion in the performance of one's duty."[32]  Having failed to demonstrate the second element of the cause of action, I entered judgment in favor of the Debtor.[33]

On November 20, 2012, the Panel issued a decision in which it concluded that I correctly found the existence of a technical trust, but erred in my determination that the Debtor was not an ERISA fiduciary.[34]  The Panel then held that "even if an ERISA fiduciary does not *per se* satisfy the § 523(a)(4) requirement for 'fiduciary capacity,' an analysis of [the Debtor's] control and authority over the plan in functional terms nonetheless yields the conclusion that he acted as a fiduciary of a technical trust imposed by common law."[35]  Because I had not reached the final element of 11 U.S.C. § 523(a)(4), namely, whether the transaction was a "defalcation" within the meaning of that section, the Panel remanded for further proceedings.[36]

On remand, I entered a pre-trial order and directed the parties to file a joint pre-trial statement in advance of trial, setting forth any agreed facts.  On February 13, 2013, the parties filed the PTS, in which they agreed to a determination of this adversary proceeding on stipulated facts.[37]  The next day, I took the matter under advisement, but ultimately suspended consideration of the matter pending the Supreme Court of the United States' decision in *Bullock v. BankChampaign, N.A.*[38]  The Supreme Court has issued its decision and the matter is now ripe for determination.

---

[32] *Id.* at 658.

[33] *Id.* at 659.

[34] *In re Fahey*, 482 B.R. at 692-694.

[35] *Id.* at 695.

[36] *Id.* at 696.

[37] PTS, Docket No. 57 at ¶ III.

[38] *Bullock v. BankChampaign, N.A.*, 133 S. Ct. 1754 (2013).

### III. POSITIONS OF THE PARTIES

  A. The Plaintiff

  The Plaintiff argues that the Debtor's failure to pay Contributions was a defalcation within the meaning of 11 U.S.C. § 523(a)(4) because as a fiduciary of the Funds, the Debtor owed a duty of loyalty that required him to act in the Funds' best interest and not engage in "self-dealing and self-preservation."[39] The Debtor violated the duty of loyalty by "prioritiz[ing] the payment of corporate expenses in order to benefit himself rather than pay the employee benefit contributions due and owning," and the Plaintiff argues that a defalcation may be presumed from this breach.[40] The Plaintiff contends that I need only find "some degree of fault, closer to fraud" and not "strict specific intent" in order to conclude that the Debtor committed a defalcation.[41] The Plaintiff further states that the Debtor's failure to pay Contributions constitutes violations of various statutes, both civil and criminal,[42] and offers these violations as proof that a defalcation occurred.

  B. The Debtor

  The Debtor contends that his failure to pay the Contributions is a mere "breach of contract for which [the Debtor] cannot be found to have been guilty of fraud or defalcation."[43] He also quotes *In re Baylis* extensively with respect to the level of fault required for defalcation,

---

[39] Memorandum in Support of Motion for Summary Judgment, Docket No. 17 at 11.

[40] *Id.*

[41] *Id.* at 10 (*citing Rutanen v. Baylis (In re Baylis)*, 313 F.3d 9, 18-19 (1st Cir. 2002)).

[42] *See* Mass. Gen. Laws ch. 109A, § 6(b); Mass. Gen. Laws ch. 151D, § 11.

[43] Opposition Memorandum, Docket No. 29 at 6.

7

presumably implying, but without expressly stating, that the Debtor did not exhibit the requisite level of fault.[44]

## IV. DISCUSSION

Section 523(a)(4) of the Bankruptcy Code excepts from discharge debts for "defalcation while acting in a fiduciary capacity. . . ."[45] This exception requires a creditor to show, by a preponderance of the evidence,[46] that: (1) an express or technical trust existed "prior to the act creating the debt and without reference to the act,"[47] (2) the debtor acted in a fiduciary capacity with respect to the trust, and (3) the debt arises from a defalcation, as the term is used in 11 U.S.C. § 523(a)(4).[48] Here, the only the third issue remains.

The exact meaning of "defalcation" as it is used in 11 U.S.C. § 523(a)(4) has long confounded the courts. As explained by the Supreme Court in *Bullock*:

> Congress first included the term "defalcation" as an exception to discharge in a federal bankruptcy statute in 1867. *See* [*Rutanen v. Baylis (In re Baylis)*, 313 F.3d 9, 17 (1st Cir. 2002)]. And legal authorities have disagreed about its meaning almost ever since. Dictionary definitions of "defalcation" are not particularly helpful. On the one hand, a law dictionary in use in 1867 defines the word "defalcation" as "the act of a defaulter," which, in turn, it defines broadly as one "who is deficient in his accounts, or fails in making his accounts correct." 1 J. Bouvier, Law Dictionary 387, 388 (4th ed. 1852). *See also* 4 Oxford English Dictionary 369 (2d ed. 1989) (quoting an 1846 definition that defines the term as "'a breach of trust by one who has charge or management of money'"). Modern dictionaries contain similarly broad definitional language. Black's Law Dictionary, for example, defines "defalcation" first as "Embezzlement," but, second, as "[l]oosely, the failure to meet an obligation; a nonfraudulent default." Black's Law Dictionary 479 (9th ed. 2009) (hereinafter Black's). See also American Heritage Dictionary 474 (5th ed. 2011) ("To misuse funds; embezzle");

---

[44] *Id.*at p. 7-9 (*quoting In re Baylis*, 313 F.3d at 20-24).

[45] 11 U.S.C. § 523(a)(4).

[46] *Grogan v. Garner*, 498 U.S. 279, 286 (1991).

[47] *M-R Sullivan Mfg. Co. v. Sullivan (In re Sullivan)*, 217 B.R. 670, 675 (Bankr. D. Mass. 1998).

[48] *Chao v. Duncan (In re Duncan)*, 331 B.R. 70, 77 (Bankr. E.D.N.Y. 2005).

4 Oxford English Dictionary, *supra*, at 369 ("monetary deficiency through breach of trust by one who has the management or charge of funds; a fraudulent deficiency in money matters"); Webster's New International Dictionary 686 (2d ed. 1954) ("An abstraction or misappropriation of money by one, esp. an officer or agent, having it in trust"); Webster's Third New International Dictionary 590 (1986) ("misappropriation of money in one's keeping").[49]

Analyzing their precedent with respect to the interpretation of the "fraud" portion of 11 U.S.C. § 523(a)(4), the Supreme Court held that defalcation

> includes a culpable state of mind requirement akin to that which accompanies application of the other terms in the same statutory phrase. We describe that state of mind as one involving knowledge of, or gross recklessness in respect to, the improper nature of the relevant fiduciary behavior.[50]

The Supreme Court went on to explain:

> Thus, where the conduct at issue does not involve bad faith, moral turpitude, or other immoral conduct, the term requires an intentional wrong. We include as intentional not only conduct that the fiduciary knows is improper but also reckless conduct of the kind that the criminal law often treats as the equivalent. Thus, we include reckless conduct of the kind set forth in the Model Penal Code. Where actual knowledge of wrongdoing is lacking, we consider conduct as equivalent if the fiduciary "consciously disregards" (or is willfully blind to) "a substantial and unjustifiable risk" that his conduct will turn out to violate a fiduciary duty. ALI, Model Penal Code § 2.02(2)(c), p. 226 (1985). *See id.*, § 2.02 Comment 9, at 248 (explaining that the Model Penal Code's definition of "knowledge" was designed to include "'wilful blindness'"). That risk "must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a *gross deviation* from the standard of conduct that a law-abiding person would observe in the actor's situation." *Id.*, § 2.02(2)(c), at 226 (emphasis added). *Cf. Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194, n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) (defining scienter for securities law purposes as "a mental state embracing intent to deceive, manipulate, or defraud").[51]

---

[49] *Bullock v. BankChampaign, N.A.*, 133 S. Ct. at 1758.

[50] *Id.* at 1757.

[51] *Id.* at 1759-1760.

9

In closing, the Supreme Court noted that this standard is similar to that set forth by the United States Court of Appeals for the First Circuit in *In re Baylis* and adopted by the United States Court of Appeals for the Second Circuit in *In re Hyman*.[52]

Pursuant to 29 U.S.C. § 1104, an ERISA fiduciary "shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries. . ."[53] In *Pension Benefit Guar. Corp. v. Solmsen*, the court held that were a defendant "assum[es] conflicting roles as a fiduciary and as an officer of a struggling corporation, defendant prevented himself from fulfilling his duty to act with complete loyalty to Plan participants."[54] The First Circuit has previously held that such a breach of the duty of loyalty constitutes a defalcation. In *In re Baylis*, the First Circuit explained:

> Defalcation may be presumed from breach of the duty of loyalty, the duty not to act in the fiduciary's own interest when that interest comes or may come into conflict with the beneficiaries' interest:
>
>> A trustee occupies a position in which the courts have fixed a very high and very strict standard for his conduct whenever his personal interest comes or may come into conflict with his duty to the beneficiaries. As long as he is not acting in his own interest the standard fixed for his behavior is only that of a reasonable degree of care, skill, and caution. But when the trustee acts in his own interest in connection with the performance of his duties as trustee, the standard of behavior becomes more rigorous. In such a case his interest must yield to that of the beneficiaries.
>
> 2A [A. Scott, The Law of Trusts] § 170.25 [(W.F. Fratcher ed., 4th ed. 2001)]. As with the other fault-based exceptions, fault may be presumed from the circumstances, here a violation of the duty of loyalty.[55]

---

[52] *Id.* at 1761 (*citing In re Baylis*, 313 F.3d at 9; *Denton v. Hyman (In re Hyman)*, 502 F.3d 61, 69 (2d Cir. 2007)).

[53] 29 U.S.C. § 1104(a)(1).

[54] *Pension Benefit Guar. Corp. v. Solmsen*, 671 F. Supp. 938, 946 (E.D.N.Y. 1987).

[55] *In re Baylis*, 313 F.3d at 20-21.

Under the Trust Agreements, unpaid contributions that were due and owing were assets of the Funds. The Debtor does not dispute that he was aware of his obligations to the Funds, but nonetheless failed to remit the assets. Instead, the undisputed facts indicate that the Debtor prioritized the payment of corporate expenses that were beneficial to him, such as the Citizens Bank loan which he personally guaranteed and his personal loan to Zani, over his obligations to the Funds.[56] In so doing, he violated the duty of loyalty to the beneficiaries of the Funds. Therefore, I find that the Debtor committed a defalcation within the meaning of 11 U.S.C. § 523(a)(4).

Having already satisfied the other elements of 11 U.S.C. § 523(a)(4), the Plaintiff is entitled to judgment as a matter of law that the Contributions are nondischargeable.

## V. <u>CONCLUSION</u>

In light of the foregoing, I will enter judgment in favor of the Plaintiff.

_/s/ William C. Hillman_

———————————————
William C. Hillman
United States Bankruptcy Judge

Dated: June 11, 2013

Counsel Appearing:

    Catherine M. Campbell and Melissa A. Brennan, Feinberg, Campbell & Zack, P.C.,
        Boston, MA, for Charles Raso, the Plaintiff
    Gary W. Cruickshank, Law Office of Gary W. Cruickshank, Boston, MA,
        for James M. Fahey, the Debtor

---

[56] Although the Plaintiff contends that Zani's weekly payments to the Debtor were wages, it is ultimately irrelevant as either demonstrate that the Debtor was putting himself ahead of the Funds.